UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

***

REYNALDO AGAVO,

Petitioner,

v.

CALVIN JOHNSON,[1] *et al.,*

Respondents.

Case No. 2:13-cv-01741-JCM-DJA

ORDER

In this represented matter, Reynaldo Agavo ("petitioner" or "Agavo"), filed a second amended petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 50.) This matter is now before the court for decision on Agavo's motion for evidentiary hearing and adjudication on the merits. The court denies the motion for evidentiary hearing, grants the petition on ground one, and denies the remaining grounds of the petition without prejudice.

*Background*

Agavo challenges his 2010 jury convictions for sexual assault and lewdness with a child under 14 years of age, for which he was sentenced to, *inter alia*, life imprisonment with parole eligibility in 20 years. (ECF No. 23-7.) The convictions are the result of Agavo's second trial as his first trial ended in a deadlocked jury and mistrial. (ECF Nos. 18-3 at 7; 23-7.)

In his petition, Agavo claims, *inter alia*, that his rights to confrontation and to present a defense under the Fifth, Sixth, and Fourteenth Amendments, were denied when he was precluded from cross-examining the mother of the alleged victim about her previous testimony concerning her daughter's prior sexual abuse accusations against Agavo. (ECF No. 50 at 12–16.)

---

[1] The state corrections department's inmate locator page states that Agavo is currently incarcerated at High Desert State Prison. *See* https://ofdsearch.doc.nv.gov/form.php (retrieved October 2021, under identification number 93976). The department's website reflects Calvin Johnson is the warden for that facility. *See* https://doc.nv.gov/Facilities/HDSP_Faciltiy/ (retrieved October 2021). At the end of this order, the court directs the clerk to substitute Agavo's current physical custodian, Calvin Johnson, as a respondent for prior respondent Dwight Neven, pursuant to, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure

The court summarizes trial evidence and related state court record material and proceedings as a backdrop to its consideration of the issues presented in the case.[2]

*A.  Natalia Diaz*

Natalia Diaz testified she is the mother of V.D., the ten-year-old complaining witness. Diaz began an affair with Agavo in Hesperia, California in 2003. She later learned he was married with children. Diaz got pregnant, told Agavo the child belonged to him, and bore a son in February 2004. Diaz supported herself with government assistance and her sister's generosity. In May 2004, Diaz moved to her aunt's home in Victorville, California and Agavo moved to Las Vegas, Nevada. (ECF No. 20 at 116–20, 143–47.)

According to Diaz's March 2005 preliminary hearing testimony,[3] V.D. cried while watching a man abuse a woman on television at her aunt's home in August 2004. Diaz said she spent "a very long time" "insisting" V.D. tell her whether something happened to her before V.D. told her Agavo sexually abused her more than ten times while Diaz was pregnant. According to Diaz, V.D. said Agavo "touched her," and would "tie her," "block her mouth," and "show her adult movies." Diaz reported these allegations to police in Hesperia, California, but "nothing happened." (ECF No. 16-6 at 61, 65–69.)

At trial, Diaz testified that in December 2004, just four months after V.D. made sexual abuse accusations against Agavo in California, Diaz accepted Agavo's offer to rent her an apartment in Las Vegas "without any sort of promises" after Diaz's aunt told her she had to move out to make way for a cousin. Diaz said Agavo moved her and the children to a Las Vegas hotel in December 2004, and while Agavo lived elsewhere, he paid her living expenses. (ECF No. 20 at 120, 122–23, 147–51.)

*///*

---

[2] The court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the court overlooked it in considering Agavo's claims.

[3] Diaz's preliminary hearing testimony was not presented at trial. It is summarized here for context because it is the subject of the precluded cross-examination at issue in ground one.

Diaz testified that in January 2005, Agavo rented a trailer and Diaz and the children lived there for three days before Agavo moved in with them. She said she slept on a sofa-bed in the living room with her infant and V.D., who "always" slept with her, while her 16-year-old son and Agavo each slept in separate bedrooms. Diaz occasionally had sex with Agavo in his bedroom. (*Id.* at 124, 132–36, 151–52, 182.)

Diaz testified that in February 2005, she found a drawing of a bride and groom near the place where V.D. usually sat in Agavo's car. The drawing alarmed her because V.D. "can't draw faces that are that close that are looking at each other" and "kissing each other." Diaz speculated the groom in the drawing wore a crown and the crown signified Agavo because his first name is Reynaldo and "Rey" means "king" in Spanish. Diaz admitted she did not mention a crown in prior testimony (at the preliminary hearing or the first trial) or in her handwritten statement to police, but testified she told police about it. Detective Christopher O'Brien of the Las Vegas Metropolitan Police Department testified Diaz did not mention a crown during his interview with her. (ECF Nos. 20 at 124–26, 129–30, 152–62, 181; 20-1 at 30; 25-1 [bride-and-groom drawing].)

Diaz testified she asked V.D. if she drew the bride and groom but V.D. cried and refused to answer. Diaz told V.D. she needed to know who drew it and where it came from. V.D. told Diaz that Agavo gave it to her. Diaz asked V.D. if something else had happened and V.D. said Agavo molested her. Diaz, however, admitted it would not surprise her if she previously testified she directly asked V.D. if Agavo molested her, and when V.D. replied, "no," she confronted V.D. with the drawing until V.D. tearfully said Agavo gave it to her. Diaz testified V.D. told her Agavo gave her other drawings that were kept in a trailer closet and drawings of his private parts that she threw in the garbage. However, Detective O'Brien testified he found no drawings when he searched the trailer. (ECF Nos. 20 at 126–28, 165, 174–78; 20-1 at 26–29.)

Diaz testified V.D. told her Agavo touched her where she goes "pee-pee" and made her perform oral sex in a room in the trailer where Agavo kept speakers (not Agavo's bedroom). Diaz also said she told police Agavo kissed V.D. so hard it drew blood. But neither Detective O'Brien nor Child Protective Services Investigator, Christina Graham, testified V.D. told them Agavo abused her in a room in the trailer where he kept speakers or kissed her so hard it drew blood. And

Detective O'Brien testified that during his interviews with Diaz and V.D., neither of them alleged that Agavo engaged V.D. in oral sex. Likewise, Phyllis Suiter, a board-certified nurse practitioner who examined and questioned V.D. about her abuse allegations, testified that V.D. denied Agavo engaged her in oral sex. (ECF Nos. 20 at 128, 171–73, 179; 20-1 at 34, 58.)

Diaz testified she told police that V.D. reported the abuse happened while Diaz showered. However, Detective O'Brien and Investigator Graham each testified V.D. told them the abuse happened on the sofa-bed in the living room while Diaz and her infant were present in the bed. Nurse Suiter testified V.D. told her the abuse occurred in the bed in the living room, but Diaz was not present. (ECF Nos. 20 at 39–40, 65–66, 165, 173–74; 20-1 at 30–31, 56.)

Diaz said V.D. told her the abuse occurred three times. However, Detective O'Brien and Investigator Graham each testified V.D. told them the abuse occurred five to ten times and Nurse Suiter said V.D. told her it occurred "lots of times." (ECF Nos. 20 at 38–40, 65, 84, 165, 168, 172–75; 20-1 at 30, 33, 55.)

Diaz testified she was "afraid" because V.D. told her Agavo threatened to kill all of them if V.D. disclosed the abuse. She said, after V.D. spoke with Detective O'Brien and Investigator Graham, she and the children stayed at the trailer with Agavo until the following day when Alberto Delgado moved them to his home in California. (ECF No. 20 at 138, 166–68.)

*B.   The complaining witness, V.D.*

Ten-year-old V.D. testified she moved from Victorville, California to Las Vegas with her mother and two brothers when she was eight years old. She did not like Las Vegas and was happier in Victorville. She did not recall the names of her school or friends in Las Vegas. She said she liked to write stories and made-up stories at school. She said she knew the difference between the truth and a lie. She admitted she had referred to Agavo as her "stepdad" even though her mother was not married to him. (ECF No. 19 at 30–31, 36–37, 117, 120–23, 146–48.)

V.D. said the bride-and-groom drawing depicted a wedding including a "boy" kissing a girl while wearing a crown. V.D. testified her mother appeared "a little bit" mad at her when her mother confronted her with the drawing and her mother said the drawing was "yucky" or "bad." V.D. said she did not create the drawing and she wrote "Rey" as the name of the person who gave

it to her. V.D. testified Agavo said she was the bride and he was the groom. V.D. said she told her mother that Agavo drew the bride-and-groom drawing and other drawings kept in a closet at the trailer. (ECF Nos. 19 at 49–56, 106–10, 183–93, 198–99; 25-1.)

V.D. said she slept on a sofa-bed with her mother and baby brother in the living room of the trailer but slept alone on weekends. She admitted, however, that she previously testified her mother and brother always slept with her. She agreed that, until the second trial, she had not previously testified she slept alone on weekends. (ECF No. 19 at 40–42, 158–60.)

V.D. wrote "Rey" as the name of the person who woke her at night, removed his shorts, and got in bed with her naked for a "couple minutes." However, Investigator Graham testified V.D. told her Agavo never got into bed with her and was never naked during the abuse. V.D. testified Agavo did not remove her clothes but put his hand under her pajamas and underwear and used his hand to place her hand on his private parts for a period of "seconds." She also said Agavo touched her breasts ("chi-chis") and private parts and used his finger to touch "a little bit" inside the wet part of her private part. She further testified Agavo said "he would kill us" if she told anybody about the abuse. (*Id.* at 52–55, 63–69, 96, 98, 100–06, 218–20.)

*C.  Detective O'Brien and CPS Investigator Graham*

In addition to their previously referenced testimony, Detective O'Brien, and Investigator Graham each testified that, together, they interviewed V.D. at her Las Vegas grammar school the day after V.D. imparted the allegations in Las Vegas to Diaz.[4] According to Investigator Graham, V.D. said the abuse started "in Las Vegas" in "mid-December." V.D. said Agavo abused her two days earlier on the sofa-bed while her mother and infant brother were present in the same bed and her mother awoke during the abuse but saw nothing. V.D. told them that Agavo woke her, touched the wet part of her private part underneath her pajamas, and had her touch his penis. V.D. said Agavo wore pants and exposed his penis by removing it from his pants. She also said Agavo threatened to kill her if she told her mother. (ECF No. 20 at 24, 38–40, 64–69, 76, 78–79, 82–84.)

///

---

[4] Graham testified the first three-quarters of the interview with V.D. is missing from the transcript due to a broken tape. The remainder of the interview transcript was admitted into evidence without objection. (ECF No. 20 at 49, 63–64.)

*D.  Nurse Phyllis Suiter*

Phyllis Suiter, a board-certified nurse practitioner, testified she performed a physical sexual abuse examination on V.D., but V.D.'s genitals looked normal. Nevertheless, Suiter could not rule out sexual assault because many forms of sexual touching do not cause injury. According to Suiter, Diaz was not present, and V.D. did not cry, during her examination, but V.D. told Suiter she occasionally cried when her mother was mad at her. (ECF No. 20-1 at 44, 51, 63, 66, 93–95.)

Suiter testified she assumes children are truthful during exams and never questions sexual abuse allegations. Suiter asked V.D. whether she had symptoms consistent with sexual abuse and although V.D. reported headaches, she reported no enuresis (involuntary urinating in pants or bed) or urinary tract infections. Suiter asked V.D. whether anyone touched her genitals and V.D. named her "step-dad," Rey. V.D. told Suiter she slept with her mother and little brother, but her mother was in Agavo's room the last time the abuse happened. V.D. told Suiter that Agavo waited in the bathroom until she fell asleep and then woke her and touched her front private. V.D. told Suiter that Agavo rubbed her breasts but did not engage in oral sex. Suiter said V.D. reported Agavo threatened to kill her if she said anything to her mother. (*Id.* at 54–59, 71–75, 91–94.)

Suiter said she asked V.D. whether Agavo showed her pictures or "videos," and V.D. told her Agavo drew a picture of his private in her hand (but there was no testimony that V.D. accused Agavo of showing her adult movies). Suitor also asked V.D. whether any "force" was used by asking "did you feel like you could not get away from him when he was doing these things." V.D. told her Agavo "grabbed her arm and would hold her hand to touch his private" (but there was no testimony that V.D. accused Agavo of tying her or blocking her mouth). (*Id.* at 60–61.)

*E. Dr. Mark Chambers*

Psychologist, Dr. Mark Chambers, testified for the defense that it is "surprisingly easy" to induce children to believe things happened that did not. He identified the following interview techniques as suggestive: (1) leading questions; (2) repeatedly asking the same question in multiple interviews; (3) reinforcing certain answers; (4) vilifying or negative comments like, "we will protect you," or "you're safe with us;" and (5) biased interviewers with preconceived notions. (ECF Nos. 21 at 162; 21-1 at 6–10.)

6

Chambers testified a "paucity of details," i.e., when most of the child's responses are "yes" or "no" and the child does not give details about what happened, is a warning sign for suggestion. He said V.D. did not give her own details in the transcribed portion of her statement to Detective O'Brien and Investigator Graham, or during the first court hearing (the preliminary hearing); instead V.D. gave one or two-word responses to "91%" of the questions. Chambers said this raised concerns the information was not coming from V.D. but from the interviewers (or examiners). He explained that when interviewers try to connect emotionally to children to get them to open-up, they may unwittingly produce responses based on how they ask the question rather than the contents of the question. (ECF No. 21-1 at 10, 18–21, 25–26.)

According to Chambers, Asymmetric Distribution of Details ("ADD"), where a child recalls in vivid detail some facts about the time when the abuse occurred, but does not recall other equally important facts, may indicate their memory was aided or induced by questioning. Chambers said there is evidence of ADD in V.D.'s March 2005 (preliminary hearing) testimony because she did not recall the names of her friends, school, or teacher in Las Vegas, or details about what happened, but specifically recalled wearing white pajamas bearing red flowers during the alleged abuse. Chambers said this raised concern about suggestibility because V.D. previously did not recall the details of her clothing. Chambers testified another instance of ADD occurred when V.D. had no recollection of the bride-and-groom drawing during her March 2005 preliminary hearing testimony but later recalled it in detail in her January 2006 testimony at the first trial. Chambers explained that, with the passage of time, one expects recollection of fewer details or a foggier memory, rather than recollection of added details. (*Id.* at 10–11, 21–24, 100–01.)

Chambers explained V.D.'s discrepancies raise concerns her statements are not recalled but are the product of suggestion and questioning. Chambers explained that when the first person to interview a child is not trained in proper techniques – even if subsequent interviewers are trained – "you have potential contamination even before the professionals . . . have a chance to talk to the child." For example, Diaz said V.D. claimed the abuse occurred while Diaz showered, but V.D. said it happened, *inter alia*, in a bed in her mother's presence. (*Id.* at 29, 34–35.)

///

7

Chambers testified inconsistencies do not necessarily mean a child is fabricating or the child's story is the product of suggestion, however, he explained children try to please interviewers, so suggestion is more likely when interviewers are persons of status such as parents, teachers, or police. For example, Chambers explained in the present trial the judge asked V.D. whether she knew the meaning of a question the examiner asked and V.D. testified, "yes." However, when the judge asked V.D. if she understood the question, V.D. had no answer. When the judge again asked V.D. whether she understood, V.D. changed her testimony to "no." Chambers said this suggests V.D. said what she believed people expected her to say. (*Id.* at 26, 31–32; *see also* ECF No. 19 at 156–57.)

Chambers testified false allegations may occur where another person coerces or persuades, and he saw evidence in Diaz's prior testimony that indicated coercion. Chambers explained Diaz previously testified she asked V.D. if Agavo abused her and V.D.'s response was "no," but Diaz continued to question V.D. until her answer was "yes." Chambers explained, when a parent is angry, and a child is facing a situation where the child knows she is expected to say something is true that is not true, the child may resolve the conflict by giving no response to questions or by deflecting blame onto others. (ECF No. 21-1 at 67–74, 85, 87.)

*F.  Social Worker John Pacult*

John Pacult, a licensed clinical social worker who specializes in working with victims and perpetrators of sexual abuse, testified for the state. Pacult testified only about 10 to 15 percent of his practice concerns child abuse victims. In most cases, he said, the individual is already a confirmed sexual abuse victim when they arrive at his office and he does not question the validity of the abuse. Pacult cautioned child suggestibility is "not a specific area or focus" that he "dealt with" and although he was "familiar with the concept," he admitted, "I'm not an expert in it. That's for sure." (ECF No. 22 at 123, 138–39, 156–57, 161–68.)

Pacult agreed there are instances where children lie about sexual abuse and where children believe they are victims of sexual abuse but are not. Pacult also agreed it is possible to suggest sexual abuse by telling a child something often enough to induce a false memory. He said he believes the only way a child can adopt a false memory is repeated questioning. Pacult said "bad

ways" to interview a child victim include (1) "very leading questions;" (2) questions that suggest the answer; and (3) "yes or no, what are closed-ended questions as opposed to open-ended questions." (*Id.* at 146, 169–72.)

Pacult testified it is not uncommon for a child of V.D.'s age and culture "to sometimes go through long periods of time in the therapeutic process and never talk about what happened due to various reasons." Pacult opined that V.D.'s inconsistencies and reluctance to talk about the abuse were "normal" throughout the course of the hearing transcripts and her videotaped testimony. Pacult noted there were minor variations in V.D.'s report about what happened, but "it's common for victims to remember the specifics of what happened" and not recall "other things." He did not find it "terribly" significant that V.D. said she wore different pajamas during different retellings of the story. He said he personally encountered only one instance where an adult's sexual abuse allegations turned out to be false, which he said is consistent with research findings that only about one percent of all complaints are false. (*Id.* at 147–48, 150, 152–53.)

*G.  Reynaldo Agavo*

Agavo testified he was married for 26 years and had six daughters. He was a machine operator, part-time musician, and nightclub co-owner. He admitted he had an affair with Diaz, did not tell Diaz he was married, and kept the affair from his wife. When Diaz announced she was pregnant, he doubted paternity. He nevertheless promised to "take care of the child" if it belonged to him, but Diaz never obtained a DNA test. (ECF No. 22 at 29–32, 34–37.)

Agavo testified he moved to Las Vegas in July 2004 and later called Diaz out of concern for the child (because he was not sure whether he was the father or not). He told Diaz he would help her get an apartment after her aunt kicked her out, and he moved Diaz and her children into a hotel in Las Vegas on December 2, 2004. He left for Mexico on December 7, 2004 to attend his father's funeral while Diaz returned to California. He returned to Las Vegas on December 15, 2004 and Diaz returned two days later. Agavo said Diaz stole some of his musical equipment and absconded in his car with her children on January 1, 2005, but they returned with his equipment on January 12, 2005. (*Id.* at 37, 39–43, 71, 113.)

///

9

Agavo testified he agreed Diaz and the children could stay at the trailer for a limited time on the condition Diaz file for child support and obtain a DNA test for her infant son. He said, if Diaz filed for child support, and the paternity test was positive, he would know how much support he must pay her. Agavo said Diaz and her children lived at the trailer for about two or three weeks, as Diaz and the children were in California part of the time. (*Id.* at 34–35, 41, 49.)

Agavo testified he slept on his bedroom floor at the trailer and had sex with Diaz two or three times, but Diaz always slept with her infant son and daughter and never slept in his room – not even on weekends. He said he never got up during the night and never got in bed with V.D. He said he "hardly" woke up at night and "never" woke at night to use the bathroom, but he "used" the bathroom inside his bedroom to prepare for work in the mornings and sometimes used it at night. (*Id.* at 56, 62–63, 113–14, 119–21.)

Agavo said he "hardly spoke to" V.D. because she was not there "long" but she would occasionally come to his workplace to tell him her mom wanted to see him. Agavo denied touching V.D. inappropriately, denied putting his finger in her vagina, and denied touching her "chi-chis." Agavo testified he would not have married Diaz because he did not "love her." Agavo testified V.D. was "lying," and guessed that Diaz coached V.D. to lie so Diaz could steal his instruments or because she was mad at him for making her turn down music. (*Id.* at 27–28, 64, 67, 103–06, 113–14.)

Agavo testified he has a natural drawing talent that prevents him from creating drawings like the bride-and-groom drawing, and he denied drawing it or giving it to V.D. He said he never drew at the trailer and Diaz was unaware of his talent. (*Id.* at 44–45, 77–78, 103, 109–10, 113.)

*H.  Agavo's wife, six daughters, and Las Vegas coworkers*

Rosa Jaimes testified she was married to Agavo for 26 years and they have six daughters. She was a housewife while he worked as a machine operator in Hesperia, California. She said she would not lie for Agavo. She said Agavo never did anything sexually inappropriate with their daughters and was a good father. She discovered Agavo's affair and asked Diaz to leave Agavo alone because he was married with six daughters, but Diaz "would just laugh" and "wouldn't say anything." Jaimes left Agavo when she learned Diaz was pregnant, but Agavo continued his

financial support of his family. Agavo's daughters each testified they would not lie for him and they lived with him for their entire lives (from birth until they either married or their parents separated), and he never did anything sexually inappropriate with any of them. (ECF No. 21 at 36–39, 42–45, 48–49, 53–54, 58–61, 63–67, 100–07, 109–10, 113–15, 120–23.)

Jerome Lowe testified he employed Agavo in Las Vegas beginning in June 2004 but knew Agavo as a lead threading machine operator in California for 15 years. Lowe worked alongside Agavo every day in Las Vegas. Lowe said he "wouldn't lie to protect anybody." Lowe said he saw V.D. as a "happy little girl" who came to the shop, gave "[Agavo] a hug," and took him to speak to her mother two or three times between November 2004 and February 2005. Lowe perceived V.D. as "pretty outgoing" rather than shy. Lowe considered Agavo a "pretty truthful guy" and "never experienced him lying" to him. Agavo's coworker, Jose Cedillo, knew Agavo for a year and four months, rented the trailer to him, and found no drawings in the trailer after Agavo's arrest. (ECF Nos. 20-1 at 107–09, 113–14, 116, 119–20, 122, 124; 21 at 76, 81, 94.)

Agavo challenged his judgment of conviction on direct appeal and state postconviction review. (ECF Nos. 23-48; 23-50; 23-52; 24-19; 24-20; 24-40; 46-8; 46-16.)

*Governing Standard of Review*

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, under 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially

indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Id.* (quoting *Williams*, 529 U.S. at 410). "The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409).

The Supreme Court has held, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has said "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands state-court decisions be given the benefit of the doubt." (internal quotation marks and citations omitted)).

To the extent a petitioner challenges the state court's factual findings, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). Under that clause, federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Under 28 U.S.C. § 2254(e)(1), any state-court factual findings are presumed correct unless rebutted by clear and convincing evidence, even where federal court review on the merits otherwise is *de novo. See, e.g., Pirtle v. Morgan*, 313 F.3d 1160, 1168 (9th Cir. 2002).

AEDPA's deferential standard of review "is demanding but not insatiable." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). "Deference does not by definition preclude relief." *Miller-El v.*

*Cockrell*, 527 U.S. 322, 340 (2003). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Id.* Although AEDPA requires that federal courts "give considerable deference to the state courts, AEDPA deference is not a rubber stamp." *Anderson v. Terhune*, 516 F.3d 781, 786 (9th Cir. 2008) (citing *Miller-El*, 545 U.S. at 240).

<em>Discussion</em>

In ground one, Agavo claims he was denied his rights to confrontation and to present a defense under the Fifth, Sixth, and Fourteenth Amendments when he was precluded from cross-examining Diaz about her preliminary hearing testimony in which she generally explained V.D.'s sexual abuse allegations against Agavo in California.[5] (ECF No. 50 at 12–16.) As discussed below, the state supreme court's determination that precluding the cross-examination did not violate Agavo's confrontation clause rights constitutes an objectively unreasonable application of Supreme Court authority to the facts in the record and is not entitled to AEDPA deferential review. On *de novo* review, the court finds Agavo is entitled to habeas corpus relief on ground one because preclusion of the proffered cross-examination testimony violated his confrontation clause rights and had a substantial and injurious effect in determining the jury's verdict. Because the court grants relief on ground one, the remaining grounds in the petition are moot.

A. *Procedural Background*

1. *The First Trial*

At the first trial, the court and the parties had the following discussion concerning V.D.'s prior allegations of sexual abuse in California:

> [THE STATE]: Judge, we discussed back in chambers in regards to the prior allegations in California, and I believe that the defense has not filed any sort of a motion alleging the false report. I don't think that those particular allegations will come in pursuant to NRS 50.090.
>
> THE COURT: Well, they will or they won't?
>
> [THE STATE]: They will not.
>
> THE COURT: They will not come in.

---

[5] *See Crane v. Kentucky,* 476 U.S. 683, 689–90 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (internal quotation marks and citations omitted)).

13

1    [DEFENSE COUNSEL]: [T]his is a prior bad act as to my client so I normally
2    wouldn't file -- I wouldn't myself file a pretrial motion relating to one of my client's
     bad acts, and I would just say that as long as the door is not opened and it's not --
3    nothing is suggested with regards to those prior allegations, it doesn't help me for
     those allegations to come in necessarily.

4    THE COURT: Right, you -- it may not -- you're saying that there should have been
     a motion in limine to keep them out? I mean they're not --
5

6    [THE STATE]: No, Judge.

7    THE COURT: You're not bringing them in.

     [THE STATE]: We are not bringing them in pursuant to NRS 50.090. Defense
8    counsel should not be able to get into those.

9    THE COURT: Right. Well, and I -- like she said, they don't help her because there
     may be allegations in another state, but they haven't been determined. He's not been
10    found not guilty or they haven't been dismissed, so I would think that if [defense
     counsel] brought them up she cannot -- she can't say that they're false allegations
11    because it hasn't been determined if they are.

12    [THE STATE]: That's correct, Judge, and she would have to have filed a motion.
     She hasn't done that.
13

14    THE COURT: Right, so those aren't coming in.

     [DEFENSE COUNSEL]: Unless -- I'm just saying, unless -- I just don't want the
15    State, the State witnesses, or if a door were open and something were suggested
     that I might need that prior allegation to rebut that, then I'm not saying that I
16    wouldn't go there --

17    THE COURT: So there's no reason to have anybody talk. I mean if you pretrial
     your witnesses tell them that that's not anything they need to talk about.
18

19 (ECF No. 16-26 at 8–9)[6]

20      In opening remarks, the state did not assert V.D. was too afraid to tell her mother about the

21 abuse until her mother found the bride-and-groom drawing in Las Vegas. (ECF No. 17 at 12–16.)

22

23 [6] The Nevada rape shield statute, NRS 50.090, states:

24    In any prosecution for sexual assault or statutory sexual seduction or for attempt to
   commit or conspiracy to commit either crime, the accused may not present evidence
25    of any previous sexual conduct of the victim of the crime to challenge the victim's
   credibility as a witness unless the prosecutor has presented evidence or the victim
26    has testified concerning such conduct, or the absence of such conduct, in which
   case the scope of the accused's cross-examination of the victim or rebuttal must be
27    limited to the evidence presented by the prosecutor or victim.

   Prior false accusations of sexual abuse do not constitute "previous sexual conduct" for
28 purposes of NRS 50.090. *Miller v. State*, 105 Nev. 497, 500–01, 779 P.2d 87, 89–91 (1989).

2.  *The Second Trial*

In opening statements for the second trial, the state asserted the evidence would show:

[THE STATE]: [V.D.'s] going to explain this to you that this occurred sometime between December 1st, 2004, and February 10th of 2005, and she's going to tell you how she was extremely frightened to tell anybody about this because Reynaldo told her if you tell anybody, I'm going to kill you and I'm going to kill your whole family. She was scared, scared, scared. She didn't tell anybody until finally she'll tell you her mother found the drawing of the husband and wife, the bride and groom and showed her and said, "What's this?" and V.D.'s going to tell you that she cried. She didn't know how to explain it to her mom. Finally, she did, and that is when her mother went to the WIC office
. . . .

[Diaz's] going to tell you that [V.D.] cried, cried. She was very, very disturbed. And finally, she told her mom what happened. And then [Diaz] will tell you that she didn't know what to do.
. . . .

[Diaz] will tell you her only choice was to go back to the trailer that night.

(ECF No. 19 at 17–20.)

The state later elicited Investigator Graham's testimony that V.D. told her the abuse started "in Las Vegas" in "December." *See supra* pp. 5–6. The state's motion to admit the transcript of a portion of Graham's interview with V.D. was granted without objection. (ECF No. 20 at 63–64.) The state subsequently requested permission to redact the following statement from Graham's interview transcript: "[T]he first time it ever happened was when you lived in California." The defense objected arguing the transcript "should be admitted in full," because "Ms. Graham testified . . . that the first time that it happened was here in Las Vegas and we know that that is actually not true. That is not when she alleged that it actually first happened." (*Id.* at 86–87.)

The court suggested they "bring V.D. back" to "talk all about California," and the defense agreed. But, before the state responded, the court remarked, "I thought we weren't going there" and the state agreed. The defense countered the prosecution opened the door and the court replied the door was "kind of open," but the court "shut it."[7] (*Id.* at 87–88.)

Defense counsel argued it should be allowed to ask Diaz about the California allegations because they are relevant to credibility:

---

[7] The court presumably referred to the state opening the door with Graham's interview transcript and the court shutting the door by ruling the state could redact it. The court did not address the state opening the door with opening remarks and Investigator Graham's testimony.

15

[DEFENSE COUNSEL]: [T]he State has also opened the door in saying that the only reason . . . why the mother . . . went back to the trailer where the abuse happened was because she had nowhere else to go. And actually, we know that that is actually not the case and in fact that she went of her own volition after . . . the allegations --

THE COURT: But that's --

[DEFENSE COUNSEL] -- of prior abuse happened. And . . . she also would say that she was so fearful of him because of the threats that he made against [V.D.] Well, we know that in Hesperia, California that she alleged that those threats had also been made.

So, I believe, Your Honor, that it would be patently unfair and . . . in the interest of fundamental fairness for my client that all those allegations should come in, because in fact it goes to also the credibility of [Diaz].

(*Id.* at 88.)

The state, in part, countered:

[THE STATE]: Judge, this was all agreed to prior to trial. Prior to the past trial, nothing from California came in. That was the same situation prior to this trial. If they wanted to get it in, they needed to file a motion regarding those bad acts. It was agreed that that was not going to happen.

Any -- I didn't get anything from [the state's] opening that opened that door. And if it did, it was [defense counsel's] obligation at that point to stand up and object.
. . . .

If they wanted to impeach [Diaz] in that regard, then they should have brought the motion beforehand.

(*Id.* at 88–89.)

The defense countered:

[DEFENSE COUNSEL]: [T]his goes to the theory of our defense. This goes . . . right to the heart of the fact that this is not credible. These allegations are not credible. The fact that the daughter goes to her in Hesperia, California. Says not only that he has actually touched her, but that he has bound her, that he has gagged her, that he has actually made her watch pornographic movies . . . and then he touched her over her clothes. That she was fearful for her life because he's threatened that he would kill her.

And then three months later she happily trots over to Las Vegas to live with him again. That actually -- absolutely goes to the credibility and it goes right to the theory of our defense. In the interest of . . . his constitutional right to have a fundamentally fair trial, we believe that this has to come in especially since the State has actually opened the door to this.

(*Id.* at 90.)

The court ruled:

16

THE COURT: [I] respectfully disagree with you. I believe we dealt with this in the last trial. I'm dealing with it here now. We're not going into the California incidents. There was [sic] no motions brought before me to bring that in and I am going to have this document redacted, take out the reference to California and we're staying away from California. There's my ruling.

(*Id.* at 90–91.)

Defense counsel asked permission to present an offer of proof arguing, "this goes absolutely . . . to the theory of . . . our defense." (*Id.* at 91.) The state argued, "this was the same theory that they would have had in the last trial, so they should have been on notice that if they wanted to bring . . . this stuff out they should have brought . . . a motion." (*Id.* at 91.) Defense counsel argued the state presented a "completely different opening" but the court agreed with the state: "[W]e're not going into the Hesperia issues . . . So, you're not going to be questioning any of the witnesses about any of the allegations . . . having to do with California." (*Id.* at 92.)

The defense presented an offer of proof as follows:

[DEFENSE COUNSEL]: Well then, Your Honor, I'd like to make an offer of proof as to what kinds of questions I would be asking of [Diaz], because I think it goes to the heart of the credibility and so I would like to actually read that into the record.

THE COURT: Read what?

[DEFENSE COUNSEL]: [W]hat my questioning would be regarding Hesperia, because I think that we would be able to show . . . that there are complete inconsistencies as far as her testimony. When now [sic] saying . . . I was terrified of him, I didn't know what to do because I was terrified for my daughter because he had made these threats, when actually she knew and had made allegations about these threats three months prior in Hesperia, California.

And she would also testify to the fact that her aunt was aware . . . of these allegations. That her aunt was very upset about these allegations and yet when it came time she basically kicked her out and said, I need the room. And so that she had nowhere else to go.

THE COURT: Okay.

[DEFENSE COUNSEL]: [W]e would ask her the fact that -- that she said that while they were watching -- while she was watching a T.V. program about a man abusing a girl with her -- while she was with her daughter, that her daughter started crying. That she asked her if --

THE COURT: Where is this . . . ?

[DEFENSE COUNSEL]: This is actually in the preliminary hearing transcript.

THE COURT: But --

17

[DEFENSE COUNSEL]: In Hesperia, California.

. . . .

[DEFENSE COUNSEL]: That's on page 64. That she asked her if -- if our client had molested her. That she said that he tied her up and blocked her mouth. That he would show her adult movies . . . [t]hat he got into bed with her naked . . . and that the mother was so concerned about this because he had actually threatened to kill [V.D.] at the time . . . .

(*Id.* at 92–94.)

The defense further argued the proffered cross-examination was not prior bad act evidence:

[DEFENSE COUNSEL]: Your Honor, it's not a prior bad act. This goes absolutely to her credibility. It's -- this is not a prior bad act. How is it a prior bad act because it's not an act -- they -- we -- they are saying that this actually happened. We can't be penalized --

THE COURT: Oh no, no. Even -- no matter --

[DEFENSE COUNSEL]: -- for trying to introduce his prior bad act. That's actually the State.

THE COURT: So, you're --

[DEFENSE COUNSEL]: If any reason why [sic] there -- there is a prior bad act where there needs to be a motion is because it's prejudicial to our client. That's the reason why the State is required to file a motion for a prior bad act, clearly ahead of time for this Court to determine if it's more prejudicial to our client than it is probative.

And in this case we are actually saying bring it in. We don't -- we don't feel that it is prejudicial and so we are asking to bring this in. I don't think it's appropriate for us to be required to bring in a prior bad act that goes directly to the credibility of the case at hand.

(*Id.* at 94–95.)

The state disagreed stating, in part:

[THE STATE]: Absolutely required to, Judge. I mean, that they're now saying that the constitutional right's [sic] of the Defendant are at risk, the State also has rights in this regard to a fair trial. And they had notice of this. They have a required [sic] to bring a <u>Petrocelli</u> hearing if they want to bring in these -- these prior bad acts.

. . . .

And in addition, Judge, I mean, if they are going to quarrel regarding prior bad acts, it was an understanding. And I -- I don't know if by the -- in the past trial if it was by stipulation, but there was definite -- I know the Court --

. . . .

So, the State proceeded to trial this way and -- assuming that we are going along the same path . . . .

///

18

(*Id.* at 95–96.)[8]

The defense argued (1) there was no stipulation excluding the allegations from the first trial, and (2) the state opened the door in the second trial with its opening and Graham's testimony. The defense also argued the state created a situation where it suggested to the jury things "we know are not true . . . [l]ike the fact that she was terrified of [Agavo]," and Diaz "didn't know where to go when something like this was happening," when, in truth, she had places she could have lived but chose to live with Agavo knowing her daughter's allegations of molestation. (*Id.* at 96–98.) The court held, "the last time we did this I ruled we're not going into California," and "[t]o now stand up and say we're going into California, when I had previously ruled that we weren't, at this time, is inappropriate." (*Id.* at 98–101.)

The next day, defense counsel requested the court clarify its reasons for precluding cross-examination about the California allegations:

> [DEFENSE COUNSEL]: [F]irst of all, let me just . . . add some things as far as -- in the Court denying us from getting into the Hesperia incident. If I could just --
>
> THE COURT: Yes. Go ahead.
>
> [DEFENSE COUNSEL]: -- add -- add on to that? As this Court is aware previously or yesterday the Court ruled that we could not get into the Hesperia incident. I think it was based on the fact that we had not filed a motion of a prior bad act. I've made a --
>
> THE COURT: It wasn't just based on that, but I did bring that up . . . but go ahead.
>
> [DEFENSE COUNSEL]: [W]hat were the other basis [sic], Your Honor?
>
> THE COURT: The fact that I previously ruled in the other case that it -- it wasn't coming in.
>
> [DEFENSE COUNSEL]: Okay. And if -- may I --
>
> THE COURT: (Indiscernible -- simultaneous speaking) but consistent.
>
> [DEFENSE COUNSEL]: Okay. And may I inquire as to -- for the prior ruling --

---

[8] In *Petrocelli* the defendant testified he killed the victim by accident. *Petrocelli v. State*, 101 Nev. 46, 51–52, 692 P.2d 503, 507–08 (Nev. 1985). The state sought to cross-examine the defendant about a "prior bad act" in which the defendant also allegedly killed his girlfriend by accident. *Id.* The purpose of the cross-examination about the prior bad act was *not to impeach the defendant*, but to support the state's argument that the second killing was not an accident. *Id.* The court held the state properly presented evidence *sufficient to demonstrate the prior bad act occurred*, and the trial judge properly weighed the probative value against the prejudicial effect before it admitted the prior bad act evidence on cross-examination. *Id.* (citing NRS 48.045(2).)

1    THE COURT: I couldn't --

2    [DEFENSE COUNSEL]: -- what was the basis of that?

3    THE COURT: At that point, I couldn't tell you what that was. It would have been
     made in the record at the time.

4

5    [DEFENSE COUNSEL]: Okay. So, if I could then add in to the record as far as
     whatever was made in the previous ruling as far as this Court denying our being
     able to go into the Hesperia incident --

6

7    THE COURT: Yes.

8    [DEFENSE COUNSEL]: -- because it was or [sic] contention that we -- just
     because we've tried a case one way, we're not certainly limited to try the case and
     have our theory of defense be limited to the way we did it the first time.

9

10   THE COURT: That's correct. Okay.

11   (ECF No. 21 at 4–5.)

12   The defense argued the cross-examination was relevant to the credibility of V.D. and Diaz:

13   [DEFENSE COUNSEL]: And we would like to just put on the record the fact that
     by not allowing us to get into the Hesperia incident, it disallowed us from going

14   into the fact that there were actually a series of allegations that were made that by
     not being able to confront cross examine [Diaz] on that that we were unable to go

15   into her motive or bias and that certainly is not anything that's collateral. Also, it
     did -- substantively denies my client's Sixth Amendment right to confront cross

16   examine any witnesses because as -- when she goes on there, we are not allowed to
     impeach her with things that would obviously call into question her credibility.

17

18   THE COURT: And her credibility -- [Diaz], the mother --

19   [DEFENSE COUNSEL]: That's correct.

20   THE COURT: Not the victim witness, [V.D.], who is the person --
     . . . .

21   [DEFENSE COUNSEL]: I think, actually, by . . . implication it would also call into
     question the daughter -- daughter's credibility because obviously if the mother

22   thinks so little of the daughter's credibility when she first makes -- makes the
     allegations that she would then go and three months later move in with our client,

23   I think that also calls into question the daughter's credibility as well. So, it would
     actually be based on both.

24

25   (Id. at 6–7.)

26   The state, in part, countered:

27   [THE STATE]: [I]n response to [defense counsel's] claims today that just because
     they tried a case one way before doesn't mean they have to try it the same way

28   again is true. However, in this case, they're deciding to change their theory of the

20

case the second day into trial. They didn't even try to ask [V.D.] about these
questions. So, it's the second day of trial they decide to jump on another horse,
which is fine, but this has already been excluded. The State had no notice that they
were going to decide to jump on this other horse and the State has a right to a fair
trial as well. And based on that, it's proper to continue to not admit the California
incident.

(*Id.* at 7.) The court concluded argument by stating, "the record's made." (*Id.* at 9.)

Nurse Suiter later testified:

A: I asked her when the first time that anything happened, and she didn't
answer me. She just shrugged her shoulders. I tried to get a little bit better idea
about time frame and sometimes using holidays helps. This was in February, so I
chose Christmas. Was it before or after Christmas and she said it was after
Christmas.

(ECF No. 20-1 at 56.)

In closing arguments to the jury, the state argued in part:

[THE STATE]: So here's a woman who's willing to, you know, go to a shelter
because she's so frightened, and she believes her daughter so much.

She gets on the phone. She immediately finds a place to go the next day.
She contacts friends and family so that they can come and get her, and she leaves
immediately the next day. Very credible. Just what a mother would do, right?
Acting like a mother bear.

[DEFENSE COUNSEL]: I would just object as to the vouching that is -- that she is
talking about when she's talking about she believes her daughter so much, how --
and along those lines.

[THE STATE]: Her behavior is consistent with a mother that believes her daughter.
She wouldn't put herself in that situation, put her -- trying to find housing. So I'm
arguing that her behavior makes her credible in this case. It's ultimately up to the
jury. [Defense counsel] will have an opportunity to respond.

[DEFENSE COUNSEL]: Your Honor, and for her saying very credible, that is also
vouching.
. . . .

[THE STATE]: -- clearly, this is argument, Judge.

THE COURT: We're in argument now [defense counsel]. So when you stand up
. . . you'll be able to address the credibility of the witnesses. Go ahead.

[THE STATE]: Thank you, Judge. And if I haven't made it perfectly clear -- I think
I have -- you are the judges of credibility. As lawyers, we can only show you what
we demonstrate as factors that increase credibility or perhaps take away from
credibility, and the State submits to you that [Diaz], what she did, her actions
demonstrate that she's credible in this case.
. . . .

So exactly what the State was arguing regarding [Diaz] and her behavior, you may
draw a reasonable inference from that that she believed her child.

(ECF No. 22-1 at 53–56.)[9] The state conceded, "[t]here's not [sic] physical evidence here that she was abused" and explained the case "boils down to V.D. and [Agavo] . . ." (*Id.* at 115, 132.)

B. *Applicable Supreme Court Authority*

> "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'"

*Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (holding that prohibiting all inquiry into a witness's potential bias stemming from the state's dismissal of a pending charge was erroneous) (quoting *Davis v. Alaska,* 415 U.S. 308, 318 (1974)); *see also Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (per curiam) (holding that prohibiting all inquiry into rape victim's extramarital affair for purposes of exposing her motive to lie was error) (additional citations omitted)).

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis,* 415 U.S. at 316 (holding defendant should have been allowed to impeach the credibility of a prosecution witness by cross-examining on potential bias deriving from the witness's probationary status). "[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51–52 (1987) (citations omitted).

If cross-examination bears on bias, reliability, or credibility, courts may not "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted [the defendant's] line of reasoning had counsel been permitted to fully present it." *Davis*, 415 U.S. at 317. It is enough that "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination." *Olden*, 488 U.S. at 232 (citing *Van Arsdall*, 475 U.S. at 680); *see also Davis*, 415 U.S. at 319 (concluding "[s]erious damage to the strength of the state's case would have been a real possibility had petitioner been allowed to pursue [the proffered] line of inquiry.").

---

[9] On direct appeal, Agavo claimed the prosecutor committed misconduct by vouching for the truthfulness of Diaz and V.D. Although the Nevada Supreme Court affirmed Agavo's convictions, it noted, "this was a very close case and such improper vouching in the future will warrant reversal as the district attorney's office has now been warned." (ECF No. 23-48 at 6.)

Where cross-examination might reasonably cause a jury to question reliability or credibility, trial judges nevertheless "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679; *see also Olden,* 488 U.S. at 232 (same); *Davis,* 415 U.S. at 316 (noting cross-examination is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation.").

The Supreme Court has qualified a trial court's discretionary restrictions on a defendant's right to confront witnesses and to present evidence must nevertheless be "reasonable" and may not be "arbitrary or disproportionate to the purposes the restrictions are designed to serve." *See Van Arsdall*, 475 U.S. at 679; *see also Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (citation omitted).

For example, in *Davis*, the trial court precluded cross-examination of an eyewitness about his probation status for a burglary conviction in a trial in which that eyewitness identified the defendant as a burglar. *Davis*, 415 U.S. at 310–11. Defense counsel posited the cross-examination would permit the defense to argue the eyewitness's identification was the product of "fear or concern of possible jeopardy to his probation" and the eyewitness may have made "a hasty and faulty identification," "to shift suspicion away from himself" or may have been under "undue pressure" from police out of fear of "possible probation revocation." *Id.* at 311. The Supreme Court noted defense counsel attempted to expose the eyewitness's state of mind at the time police questioned him, but because the trial court "shielded" the eyewitness from traditional cross-examination about his probation status, the eyewitness was able to avoid the topic and claim he had not ever been similarly questioned by law enforcement officers. *Id.* at 312–14. The Supreme Court held that by precluding the cross-examination, the eyewitness was "in effect asserting, under protection of the trial court's ruling, a right to give a questionably truthful answer to a cross-examiner pursuing a relevant line of inquiry" and "[i]t would be difficult to conceive of a situation more clearly illustrating the need for cross-examination." *Id.* at 314. The Supreme Court declined to "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted [the defense's] line of reasoning had counsel been permitted to fully presented it," but

23

concluded "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on the witness's testimony." *Id.* at 317 (citation omitted). The Supreme Court reversed because "[t]he accuracy and truthfulness of [the witness'] testimony were key elements in the state's case against petitioner" and the eyewitness "provided 'a crucial link in the proof . . . of petitioner's act.'" *Id.* at 317, 321.[10]

In *Van Arsdall*, the Supreme Court noted courts may impose "reasonable limits" on cross-examination but held the trial court violated the defendant's Sixth Amendment right to cross-examination by precluding "all inquiry" into a topic the jury "might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony." *Van Arsdall*, 475 U.S. at 679. The trial court precluded cross-examination about the state's dismissal of a witness's "pending public drunkenness charge" on the basis that the probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or due to considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Id.* at 676, n.2. The Supreme Court held preclusion violated the confrontation clause because it was error to prohibit "all inquiry into the possibility that that [the witness] would be biased as a result of the state's dismissal of his pending drunkenness charge," given a "reasonable jury might have received a significantly different impression of [the witness's] credibility had [counsel] been permitted to pursue his proposed line of cross-examination." *Id.* at 679–80, 684.

In *Olden*, the trial court precluded cross-examination of an alleged rape victim about her interracial cohabitation arrangement after she testified she lived with her mother. Defense counsel argued the cross-examination topic would have supported the defense theory that the victim had concocted a rape story to protect her husband from discovering her prior extramarital affair with her current cohabitant. *Olden*, 488 U.S. at 230. The trial court precluded the cross-examination on the grounds "it's probative value [was] outweighed by its possibility for prejudice," given "there were undisputed facts of race," that would cause "extreme prejudice" to the victim. *Id.* The Supreme Court acknowledged a court may impose "reasonable limits" on cross-examination but

---

[10] Respondent erroneously relies on *Nevada v. Jackson*, 569 U.S. 505 (2013) (per curiam). (ECF No. 72 at 5–6.) *Jackson* did not constitute clearly established Supreme Court authority when the state supreme court denied rehearing in Agavo's case on July 31, 2009. (ECF No. 23-50.)

concluded the trial court's limitation was "beyond reason" and "[s]peculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [the victim's] testimony." *Id.* at 232. Notably, the petitioner's testimony directly contradicted the alleged victim's testimony and the alleged victim's testimony was corroborated only by largely derivative testimony of the alleged victim's lover, "whose impartiality would also have been somewhat impugned" because of his relationship with the alleged victim. *Id.* at 233. The Supreme Court concluded the error was not harmless given (1) "the case against petitioner was far from overwhelming;" (2) the cross-examination's "strong potential" to show the allegations were false; and (3) the "central, indeed crucial" role the victim's testimony played in the prosecution's case. *Id.* at 232–33.

*C. The Ninth Circuit's Application of Supreme Court Authority*

The Ninth Circuit has determined what constitutes an objectively unreasonable application of Supreme Court authority under AEDPA when a state trial court precludes cross-examination designed to impeach the credibility of a witness in sexual abuse allegation cases concerning minors. *See Holley v. Yarborough*, 568 F.3d 1091 (9th Cir. 2009); *Fowler v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027 (9th Cir. 2005).

*1. Fowler*

In *Fowler*, the circuit considered a state trial court's preclusion of cross-examination about the alleged sexual abuse victim's prior statements in connection with accusations against a different man. *Fowler*, 421 F.3d at 1032, 1038. The alleged victim previously accused two different men on separate occasions. *Id.* The first man was convicted but the allegations against the second man were unsubstantiated, in part, because the alleged victim said she might have been "cautious about things" after what happened with the first man. *Id.* The defense's proffered cross-examination was based on the victim's statements she was a little "cautious about things" during an interview, and as reflected in the police report, for the case involving the second man. *Id.* The state moved to preclude cross-examination, but the defense counsel argued the cross-examination supported the defense theory that the alleged victim "had a tendency to, as she put it, be 'a little cautious about things'" and "supersensitive 'to physical contact … by adult men, and thus, to

1   "[mis]perceive [ ]," "exaggerate[ ]" or "overreact [ ]."'" *Id.* at 1032–33. The trial court precluded
2   the cross-examination out of concern it would consume an inordinate amount of court time, be
3   extremely confusing to this jury, and be significantly more prejudicial than probative. *Id.*

4          The circuit reversed holding preclusion constituted an unreasonable application of
5   Supreme Court authority and was not harmless. *Id.* at 1033–34. Without speculating whether the
6   jury would have accepted the defense line of reasoning, the circuit determined "there can be no
7   doubt that the precluded cross-examination sufficiently bore" on the alleged victim's reliability or
8   credibility such that a jury might reasonably have questioned it. *Id.* at 1039–40. The claimed
9   countervailing interests (consumption of time, confusion to the jury, and prejudice) were not
10  "sufficiently well-founded to justify precluding rather than limiting the cross-examination." *Id.* at
11  1039–41. The circuit concluded the state court's determination that precluding the cross-
12  examination was not unreasonable, arbitrary, or disproportionate, was itself objectively
13  unreasonable. *Id.* at 1041.

14         Applying the *Van Arsdall* factors, the circuit concluded the error also had a "substantial
15  and injurious effect or influence in determining the jury's verdict" because (1) the case was
16  primarily a credibility contest between the alleged victim and the defendant in the absence of
17  physical evidence or third-party witnesses to the alleged molestation; (2) the cross-examination
18  was not cumulative; (3) no evidence corroborated the defendant's account or contradicted the
19  victim's account, so the jury was left with no explanation for the discrepancy; and (4) the proffered
20  cross-examination bore on the alleged victim's reliability and credibility in the specific context of
21  the case before the jury. *Id.* at 1041–43.

22         *2. Holley*

23         In *Holley*, the state trial court precluded cross-examination of an alleged molestation victim
24  about her prior statements she did "weird stuff" in a closet with a boyfriend (the term used to
25  describe the defendant's actions toward her); a neighbor wanted to "hump her brains out;" and her
26  brother tried to have sex with her. *Holley*, 568 F.3d at 1096–97. In closing argument, the prosecutor
27  characterized the victim as a "truthful little girl," "honest little girl," and a "good little girl." *Id.* at
28  1100–01. The state appellate court upheld the preclusion finding the statements were (1) not

proved false; (2) of questionable, if any, relevance; (3) potentially unduly prejudicial; and (4) not sufficiently probative of any issue in the trial to warrant the consumption of time. *Id.* at 1098–99.

The circuit reversed explaining the proffered cross-examination was "relevant to counter the prosecution's theory of the case, as emphasized during closing argument, that [the alleged victim] would not fabricate things of a sexual nature," as it could have demonstrated the alleged victim "had a highly active sexual imagination" or "familiarity with sexual activities." *Holley*, 568 F.3d 1099. Notably, the circuit observed that "[i]n making a Sixth Amendment claim that he was denied appropriate cross-examination, [the defendant] need not show the precluded statements were consciously or maliciously fabricated." *Id.* (citing *Fowler,* 421 F.3d at 1036 (citing *Van Arsdall,* 475 U.S. at 680 and *Davis,* 415 U.S. at 311)). The circuit held that precluding the entirety of the cross-examination about the alleged victim's prior statements about sex, to avoid prejudice and waste of time, was unreasonable and disproportionate to the purposes of preclusion. *Id.* at 1099–1100 (citing *Davis*, 415 U.S. at 319–20 and *Fowler*, 421 F.3d at 1040–41). Moreover, the jury might have reasonably questioned the allegations had it known about the victim's "precociousness in sexual matters," as demonstrated by her comments to others. *Id.* at 1100.

The circuit held precluding the cross-examination violated the confrontation clause, had a "substantial and injurious effect or influence" on the verdict, and defendant was denied a "fair trial." *Id.* (citing *Van Arsdall,* 475 U.S. at 679; *Davis,* 415 U.S. at 319; and *Fowler,* 421 F.3d at 1041). The circuit noted the prosecution "needed to characterize [the alleged victim] as a child who could be relied on to tell the whole truth, and not exaggerate or fantasize about sexual issues, and this characterization might reasonably have been called into question by her prior statements." *Id.* at 1101. As the "accuracy and truthfulness" of the alleged victim were "key elements of the State's case," "the jury might have received a 'significantly different impression' of her credibility had [the defendant] been allowed" to cross-examine the alleged victim about her prior statements. *Id.*

D. *The State Court Determination*

In Agavo's case, the state supreme court rejected the confrontation clause claim on the following basis:

Agavo argues that the district court erred in precluding all reference to the victim's prior sexual abuse allegation against him in California (California allegation), which deprived him of his constitutional right to confront his accuser and to cross-examine witnesses against him. We conclude this argument is without merit.

We review a district court's decision to admit or exclude evidence for an abuse of discretion. *Thomas v. State*, 122 Nev. 1361, 1370, 148 P.3d 727, 734 (2006). A decision that "exceeds the bounds of law or reason," or is "arbitrary and capricious" constitutes an abuse of discretion. *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001). "The Sixth Amendment right to confront and cross-examine witnesses is applicable to the states through the Fourteenth Amendment's Due Process Clause." *Kaczmarek v. State*, 120 Nev. 314, 335, 91 P.3d 16, 31 (2004). However, the district court "retains wide discretion to limit cross-examination based on considerations such as harassment, prejudice, confusion of the issues, and relevancy." *Id.*

At trial, Agavo attempted to bring in the California allegation to impeach the victim's mother's credibility. He claimed that the State opened the door to the California allegation, despite the district court's previous ruling to preclude all references to the California allegation, when the State submitted into evidence a transcript of a conversation between the victim and a Child Protective Services employee that referenced the California incident. However, the district court corrected this error by having the reference removed from the transcript, thereby striking all references to the California allegation. Agavo argued that after the State introduced the issue at trial, his constitutional right to a fundamentally fair trial and Sixth Amendment right to cross-examine witnesses allowed him to raise the issue. Agavo wanted to show that the victim's mother knew of her child's prior sexual abuse allegation against Agavo, and therefore, was not acting in her child's best interest when she subsequently decided to move into Agavo's trailer. However, while the California allegation was reported to the police, no charges were filed.

Additionally, Agavo argues that the district court violated his constitutional right to confront his accuser and to cross-examine witnesses against him by precluding all references to the California allegation. As noted, the California allegation was never proven false, nor were charges ever brought. Thus, the district court could have concluded that a large portion of the trial would be consumed with the parties trying to prove or disprove the California allegation. Pursuant to NRS 48.035(1), the district court could have properly excluded the California allegation because the "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." Therefore, we conclude the district court did not abuse its discretion by precluding any reference to the California allegation.

(ECF No. 23-48 at 3–5.)

*E.  It was objectively reasonable to find the proffered cross-examination relevant and probative.*

The state supreme court implicitly determined the proffered cross-examination met the

Supreme Court's threshold requirements that (1) it be relevant, and (2) "might reasonably" cause

the jury to question the witness's reliability or credibility.[11] *See Van Arsdall*, 475 U.S. at 680 (quoting *Davis,* 415 U.S. at 318); *see also Olden*, 488 U.S. at 231; *Fowler,* 421 F.3d at 1041. This determination was objectively reasonable as the proffered cross-examination "might reasonably" have caused the jury to question the credibility of V.D. and Diaz, considering (1) the lack of physical evidence; (2) Agavo testified denying the abuse; (3) V.D.'s nonresponsive testimony and inconsistencies in response to leading questions;[12] (4) the absence of corroborating third-party testimony that was not directly derived from statements by V.D. or Diaz; (5) the imaginative quality of the California allegations compared to the Las Vegas allegations; and (6) Diaz's move to Las Vegas with full knowledge of the California allegations. *See Fowler*, 421 F.3d at 1036, 1038–39 (citing *Van Arsdall,* 475 U.S. at 679); *see supra* pp. 2–11; *see also infra* pp. 36–40.

F. *The state supreme court's finding that preclusion did not violate the confrontation clause is objectively unreasonable and not entitled to AEDPA deference.*

1. *The state court's application of potential countervailing interests for preclusion was objectively unreasonable.*

The state supreme court determined preclusion was a proper exercise of the state district court's discretion because the state district court "could have" decided the probative value of the cross-examination was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The Supreme Court has held those countervailing interests are proper bases for precluding cross-examination, provided the preclusion is reasonable, nonarbitrary, and proportionate to the purposes of the restriction. *Van Arsdall*, 475 U.S. 673; *Olden*, 488 U.S. 227; *see also Holley*, 568 F.3d at 1099; *Fowler,* 421 F.3d at 1032. However, the

---

[11] The state supreme court ruled in part that preclusion of the cross-examination was proper based on NRS 48.035, which states: "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." Had the state supreme court determined the proffered cross-examination was not relevant and probative, there would have been no reason for it to determine preclusion was appropriate on the basis its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See, e.g., Fowler*, 421 F.3d at 1039, n.8 (citations omitted) (finding the state court "implicitly concluded that the proffered evidence was to some degree relevant" because under state law "[n]o evidence is admissible except relevant evidence."); *see also* NRS 48.025(2) ("Evidence which is not relevant is not admissible.").

[12] V.D.'s responses to direct examination were so insubstantial that the state district court considered declaring her an unavailable witness. (ECF No. 19 at 75.)

state supreme court's reliance on those countervailing interests to justify preclusion here constitutes an objectively unreasonable application of Supreme Court authority to the facts in the state record and its determination that preclusion did not violate the confrontation clause is not entitled to deferential review under AEDPA.

*a. There was no record of an incurable danger of confusing the issues.*

The defense purpose and theory for presenting the existence and substance of the California allegations during cross-examination of Diaz was straightforward: (1) to attack the believability of V.D. by showing the fantastical nature of the California allegations compared to the Las Vegas allegations; and (2) Diaz's move to Las Vegas was inconsistent with a belief in V.D.'s molestation accusations. *See supra* pp. 16–21.

The proffered cross-examination was not so confusing a simple limiting instruction could not have kept the jury (and the parties) focused on the proper use and limits of the cross-examination and nothing in the state court record shows the state district court entertained any reasonable or proportionate limitation on the cross-examination in lieu of entire preclusion.

As said in *Fowler*, "our criminal justice systems routinely charge juries with deliberating in cases involving exceedingly complex factual and legal issues, often involving multiple parties and multiple events." *Fowler*, 421 F.3d at 1040. As in *Fowler*, there is no reason here to believe Agavo's jury was incompetent to follow an instruction that it may consider the California allegations, as limited by the proffered cross-examination, for its evaluation of the credibility of the witnesses concerning the Las Vegas allegations, and not concern itself with the truth or falsity of the California allegations. *See Fowler*, 421 F.3d at 1040.

The state supreme court's determination that preclusion of the entirety of the proffered cross-examination was reasonable, nonarbitrary, and proportionate to the purpose of preclusion, based on a danger of confusing the issues, without any record supporting such a danger existed, or that the state district court considered reasonable limitations, was objectively unreasonable.

*b. There was no record of a danger of unfair prejudice to the state or its witnesses.*

Preclusion on the basis that the proffered cross-examination posed a danger of unfair prejudice was unreasonable, arbitrary, and disproportionate to the purpose of preclusion because

1    the proffered cross-examination was arguably risky for Agavo, arguably advantageous to the state,

2    and would have assisted the jury by permitting it to consider relevant evidence bearing on the

3    weight of the reliability and believability of V.D. and Diaz.

4        At the preliminary hearing, Diaz testified that V.D. previously accused Agavo of sexually

5    abusing her in California by, *inter alia*, tying her, blocking her mouth, and making her watch adult

6    movies, and that Agavo threatened to kill V.D. if V.D. told anyone about it. *See supra* p. 2; *see,*

7    *e.g., Holley*, 568 F.3d at 1100 (noting cross-examination to discredit sexual abuse claims due to

8    active sexual imagination of minor victim is the very type of impeachment a defendant can engage

9    in under the confrontation clause). Diaz's testimony about the existence and general substance of

10   the California allegations, which V.D. made only a few months before she made the Las Vegas

11   allegations, was arguably prejudicial to Agavo. Defense counsel conceded this when she discussed

12   the California allegations at the first trial. *See supra* pp. 13–14. But, defense counsel reserved the

13   right, without any objection or ruling to the contrary, to use the California allegations to rebut any

14   doors the state might open at trial when she stated, "I'm not saying that I wouldn't go there" if

15   "something were suggested" and the defense needed "that prior allegation to rebut." *Id.* And, at

16   the first trial, the state district court acknowledged the defense's right to do so when it said, "I

17   would think that if [defense counsel] brought [the California allegations] up she cannot -- she can't

18   say that they're false allegations because it hasn't been determined if they are." *Id.*

19       At the second trial, although unnecessary, the defense counsel agued the state opened the

20   door with its opening statements and Graham's testimony, and the defense no longer calculated

21   that presentation of the existence and substance of the California allegations, as confined by Diaz's

22   preliminary hearing testimony, was as prejudicial as leaving it out of the jury's credibility

23   calculation. *See supra* pp. 15–21.

24       The state argued it would be unfairly prejudiced by the cross-examination because the

25   defense knew about the California allegations since the time of the preliminary hearing and the

26   state was not on notice that the defense intended to cross-examine Diaz about it. *See supra* pp. 16–

27   21. The state also contended preclusion was proper because the parties agreed, and the state district

28   court previously ruled, the California allegations were off limits during the first trial. *Id.* But the

state court record contains no such stipulation, and the state knew about Diaz's preliminary hearing testimony for the same length of time as the defense. The state also knew the relevancy of Diaz's testimony to credibility and was on notice the defense might delve into the California allegations if the state opened the door, because defense counsel reserved the right to do so during the discussion at the first trial. *See supra* pp. 13–14. Moreover, the state district court's ruling at the first trial was pursuant to the state's verbal motion to preclude the defense from introducing evidence under the rape shield statute, not the confrontation clause. *Id.* Moreover, respondents admit that, had the proffered cross-examination about the California allegations been allowed, the state might have capitalized on that testimony to argue V.D. was credible because this was not her first allegation of sexual abuse against Agavo. *See infra* note 18.

In *Fowler* and *Holley*, the Ninth Circuit considered whether the defense proffered cross-examination of the alleged victims would have personally prejudiced the alleged victims. *Holley*, 568 F.3d at 1099–1100; *Fowler*, 421 F.3d at 1040–41 (concluding whatever "temporary embarrassment" the witness might have suffered was "outweighed by [the defendant's] right" to probe the witness's credibility.). Here, unlike in *Fowler* and *Holley*, the defense was prohibited from cross-examining the alleged victim's mother, Diaz, whose credibility the state relied upon to support V.D.'s credibility. *See supra* pp. 21–22. Any danger that the California allegations might personally prejudice V.D. and Diaz was remote because the veracity of the California allegations was not decided one way or the other and was not in dispute. And, as discussed, the court could have instructed the jury to use Diaz's testimony about the existence and substance of the California allegations to determine the relative weight of credibility without concerning itself with the truth or falsity of those allegations.

On this record, the state supreme court's determination that precluding the entirety of the proffered cross-examination was a proper exercise of discretion based on a danger of unfair prejudice to the state or its witnesses was objectively unreasonable.

///

///

///

32

*c. The record reveals the absence, not admission, of the cross-examination posed a danger of misleading the jury.*

The court, counsel, and the witnesses were aware that Diaz knew V.D. claimed Agavo sexually abused her and threatened her life, and Diaz had sought the assistance of the police, before Diaz moved V.D. to Las Vegas with Agavo, but the jury did not know this when it decided credibility and guilt and when the state argued the Las Vegas allegations were a revelation to Diaz.

Precluding the proffered cross-examination permitted the state to bolster V.D.'s believability by arguing Diaz's behavior was "consistent with a mother that believes her daughter," unimpeded by the reality of the existence and substance of V.D.'s prior fantastical allegations and Diaz's move to Las Vegas with knowledge that V.D. had previously accused Agavo of sexually abusing her and threatened to kill her if she disclosed the abuse. *See supra* pp. 2, 15–21.

In considering credibility, the proffered cross-examination would have permitted the jury to fairly calculate whether the Las Vegas allegations lacked credibility as the product of childhood imagination and fantasy or as a refinement of V.D.'s prior allegations.[13] *See, e.g., Holley*, 568 F.3d at 1099 (discrediting alleged minor victim of sexual abuse by showing tendency to exaggerate or overstate, but not outright fabricate allegations, deemed relevant). As in *Davis*, preclusion was misleading, and undermined the truth finding function of cross-examination, because it unreasonably shielded Diaz from admitting facts that directly bore on the jury's determinations of her credibility, and the credibility of V.D., in a case that, as the state argued, "boiled down" to witness credibility.

The state supreme court's determination that a danger of misleading the jury justified precluding the entirety of the proffered cross-examination as reasonable, nonarbitrary, and proportionate to the purpose of preclusion, was objectively unreasonable on this record.

*2. The record shows preclusion based on undue consumption of time on collateral matters was objectively unreasonable.*

The state supreme court alternatively decided preclusion was a proper exercise of discretion because the court "could have concluded" "a large portion of the trial" would be

---

[13] *See Fowler*, 421 F.3d at 1039, n.7 (noting fantasy by child witnesses is well-documented) (citing *Craig*, 497 U.S. at 868 (Scalia, J., dissenting) (listing "studies show[ing] that children are substantially more vulnerable to suggestion than adults, and often unable to separate recollected fantasy (or suggestion) from reality.")).

"consumed with the parties trying to prove or disprove the California allegations." The Supreme Court has held such concerns may provide a proper basis to limit cross-examination, provided the restriction is reasonable, nonarbitrary, and proportionate to the purposes of exclusion. *See Van Arsdall,* 475 U.S. at 670, 679. Here, however, the record shows preclusion of the entirety of the proffered cross-examination on that basis was unreasonable, arbitrary, and disproportionate to the purposes of the restriction.

The veracity of the California allegations would not have unduly consumed time on a collateral matter because the parties agreed the California allegations were proved neither true nor false and neither party sought introduction of extrinsic evidence (e.g., police reports, police testimony) to assert the truth or falsity of the California allegations. *See supra* pp. 13–14; *see,* e.g., *Holley,* 568 F.3d at 1099 (entirely precluding, rather than reasonably restricting, cross-examination about alleged victim's prior statements of sexual conduct was constitutional error regardless of whether the statements were false because a jury might infer the prior statements countered the state's theory the victim couldn't have fabricated her allegations).[14]

The defense intended to use the cross-examination to argue, in direct response to the state's opening statements and Investigator Graham's testimony, that, *inter alia*: (1) the fantastical substance of the California allegations called into question V.D.'s believability about the Las Vegas allegations, and (2) Diaz (and V.D.) lacked credibility because Diaz moved to Las Vegas with Agavo knowing V.D. previously accused Agavo of sexual abuse and threats against her life. *See supra* pp. 2, 15–21; *see also Holley,* 568 F.3d at 1099–1100 (evidence the victim "had a highly active sexual imagination or that she had a familiarity with sexual activities was relevant to counter the prosecution's theory of the case, as emphasized during closing argument, that [the victim] would not fabricate things of a sexual nature."). The narrow purpose of the proffered cross-examination did not include presenting the California allegations as false.[15] *See supra* pp. 2, 13–

---

[14] Defense counsel argued the cross-examination was not prior bad act evidence because neither party asserted the California allegations "actually happened." *See supra* p. 18.

[15] Respondents' suggestion the cross-examination was valuable only if Agavo could prove the California allegations untrue, is unpersuasive because the jury could have received a significantly different impression of the credibility of Diaz and V.D. had defense counsel been permitted to

21. The state district court therefore understandably expressed no concern that the proffered cross-examination would unduly consume time litigating the veracity of the California allegations.

      The state supreme court relatedly decided preclusion was proper based on concerns the cross-examination would unduly consume time. But, as in *Holley*, the record reflects the district court did not consider reasonable time limits on the cross-examination. *See Holley*, 568 F.3d at 1100 (finding state court unreasonably concluded the proffered evidence would not be sufficiently probative to warrant the consumption of time because the evidence would not have significantly lengthened the trial and the court could have taken reasonable steps to ensure the testimony and cross-examination would not last longer than necessary to adequately present the evidence). Had the defense cross-examined Diaz about her preliminary hearing testimony, and had Diaz denied her prior testimony, the court could have reasonably restricted the defense to impeaching Diaz with her preliminary hearing testimony, for which the state had equal notice.

      Even had the state district court been concerned about undue consumption of time, precluding the entirety of the proffered cross-examination without imposing "reasonable restrictions" was unreasonable, arbitrary, and disproportionate on this record. *See also Fowler*, 421 F.3d at 1040 (finding a prediction that cross-examination "would consume an inordinate amount of time" an unreasonable basis for excluding the entirety of the cross-examination because (1) the time estimate for the cross-examination was only one-hour; (2) the defense would only resort to extrinsic evidence if the victim's responses were inconsistent with the police interview or report; and (3) the defense was "happy" to abide by restrictions to keep the cross-examination "brief," and "relatively nonintrusive" while presenting the probative facts to the jury.).

      On this record, it was objectively reasonable for the state supreme court to conclude that countervailing concerns over undue consumption of time on collateral matters justified the state district court's preclusion of the proffered cross-examination in its entirety as reasonable, nonarbitrary, and proportionate to the purpose of preclusion.

///

_____

elicit the existence and substance of the California allegations, even if confined to Diaz's preliminary hearing testimony. (ECF No. 72 at 6.); *see also infra* pp. 36–40.

35

3. *Disposition of deferential review of state supreme court's determination.*

The state supreme court's determination that preclusion was reasonable, nonarbitrary, and proportionate to the purposes of the restriction, based on the theoretical countervailing interests of confusing the issues, unfair prejudice, misleading the jury, or undue consumption of time litigating the truth or falsity of the California allegations, constitutes an objectively unreasonable application of Supreme Court authority to the facts in the record that is entitled to no AEDPA deference.

G. *Application of Supreme Court authority on De Novo Review*

1. *Preclusion violated the confrontation clause.*

On *de novo* review, and as discussed, the court finds, based on the application of Supreme Court authority to the facts in the state court record, preclusion of the proffered cross-examination violated the confrontation clause because it was objectively unreasonable, arbitrary, and disproportionate to the purposes of the preclusion.[16]

2. *Preclusion had a substantial and injurious effect or influence on the jury's verdict.*

The state supreme court did not reach the determination whether the denial of Agavo's Sixth Amendment right to cross-examination had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Fowler*, 421 F.3d at 1041 (citing *DePetris v. Kuykendall*, 239 F.3d 1057, 1061 (9th Cir. 2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). The Court therefore reviews this point *de novo*, rather than with deferential review under AEDPA, subject to any presumption of correctness attached to any state court factual findings under 28 U.S.C. § 2254(e)(1). *See, e.g., Pirtle*, 313 F.3d at 1167 (holding "when it is clear that a state court has not reached the merits of a properly raised issues, we must review it de novo"); *see also*

---

[16] The state district court expressly relied on state law procedural concerns for preclusion of the proffered cross-examination and did not rely on the countervailing interests addressed by the state supreme court. *See supra* pp. 13–22. The state supreme court did not rely on state law or a procedural default defense to reject Agavo's federal constitutional claim. *See supra* p. 28. Had the state supreme court decided state law procedure formed an independent and adequate basis to preclude the proffered cross-examination, it would have had no occasion to address the countervailing considerations upon which it relied, as already discussed in this order. It is therefore consistent that respondents did not assert a procedural default defense in either of their motions to dismiss the petition or their answer to this court. (*See* ECF Nos. 28; 56; 72 at 4–7; *see also* ECF No. 49 (ordering respondents to raise any procedural defenses "in a single consolidated motion to dismiss" and stating omission of procedural defenses is subject to potential waiver.)); *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005) ("unless a court has ordered otherwise," procedural defenses can be presented in serial filings, including the answer).

1    *e.g., Cone,* 556 U.S. at 472 (citing *Rompilla v. Beard,* 545 U.S. 374, 390 (2005) (*de novo* review

2    applies where state courts did not reach the *Strickland* prejudice prong)); *Wiggins v.*

3    *Smith,* 539 U.S. 510, 534 (2003) (same)).

4            For the determination whether constitutional error had a "substantial and injurious effect

5    or influence in determining the verdict," a court considers the following factors: (1) the importance

6    of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3)

7    the presence or absence of evidence corroborating or contradicting the testimony of the witness on

8    material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall

9    strength of the prosecution's case. *Fowler*, 421 F.3d at 1041 (citing *Van Arsdall*, 475 U.S. at 684

10   (listing factors relevant on direct review to whether a violation of a defendant's Sixth Amendment

11   right to cross-examination is harmless beyond a reasonable doubt.)).

12           a.   *The testimony of V.D. and Diaz was important to the state's case.*

13           The state admitted the credibility of V.D. was central, if not completely determinative, of

14   its case when it argued there was no physical evidence that V.D. was abused and the case "boils

15   down to V.D. and [Agavo] . . .." *See supra* p 22*; see also Fowler*, 421 F.3d at 1042 (citations

16   omitted). The state also directly tied V.D.'s believability to the testimony of Diaz when it argued

17   Diaz's "behavior is consistent with a mother that believes her daughter," and submitted the jury

18   could draw an inference Diaz's actions suggested that she believed V.D. *See supra* pp. 21–22. The

19   state also argued the jury could convict on V.D.'s testimony alone and claimed her testimony was

20   corroborated by Detective O'Brien, Investigator Graham, and Nurse Suiter, however, the

21   testimony of O'Brien, Graham, and Suiter was derived solely from the statements of Diaz and

22   V.D. (ECF No. 22-1 at 45–48, 113–14).

23           On this record, there is no question the believability of V.D. and Diaz, versus Agavo, were

24   the primary forces at stake in the trial and the importance of Diaz and V.D.'s testimony to the

25   state's case "cannot be overstated." *See, e.g., Olden*, 488 U.S. at 233 (noting credibility of

26   corroborating witness would have been "impugned" by witness's close relationship with the

27   alleged victim and because the corroborating witness's testimony was largely derived from the

28   alleged victim); *Fowler*, 421 F.3d at 1042 (finding error to preclude cross-examination bearing on

credibility where the state conceded, "[t]he instant case was primarily a credibility contest between [the victim] and [the defendant]," and "in the absence of any physical evidence or any third-party witness to the alleged molestation, [the victim's] testimony was central to the State's case[;] . . . [and] the State's case depended upon the jury believing [the victim's] testimony.").

### b. The testimony was not cumulative.

The proffered cross-examination was not cumulative "such than an effective cross-examination would not have undermined" the state's case because no other evidence demonstrated that Diaz agreed to move her daughter to Las Vegas with Agavo in the face of V.D.'s prior California accusations that Agavo molested and threatened to kill her. No other evidence demonstrated V.D. was capable of making, and knowledgeable about, fantastical abuse allegations involving tying, binding, and adult movies, as she alleged against Agavo a few months before she made the comparatively less imaginative Las Vegas allegations. *See supra* pp. 2–11.

### c. The proffered cross-examination had unique significance.

No evidence corroborated Agavo's account or contradicted V.D.'s account, so the jury was left with no explanation to resolve the discrepancy. *See, e.g., Fowler*, 421 F.3d at 1041–43.

V.D.'s credibility was undermined because her testimony primarily consisted of "inaudible" responses, and "yes" or "no" responses to leading and confirming questions.[17] And the defense was able to elicit V.D.'s admission that some of her prior statements and testimony were inconsistent with her present testimony (e.g., she testified she slept alone on weekends, but admitted she never said so in prior testimony). Through other witnesses, the defense showed inconsistencies in the statements and testimony of V.D. and Diaz. (e.g., Diaz said V.D. claimed Agavo made her perform oral sex, but V.D. denied oral sex to Detective O'Brien and Nurse Suiter). Pacult, however, lessened the impact of the permitted cross-examination when he characterized V.D.'s nonresponsive testimony as "normal" and her inconsistency not "terribly" significant. *See supra* pp. 2–11.

The proffered cross-examination about the existence and substance of the California allegations, as it bore on the credibility of V.D. and Diaz, was the only evidence that could

---

[17]*See supra* note 12.

potentially question whether the abuse occurred at all. Had the proffered cross-examination been presented, a reasonable jury could have concluded the California allegations were so imaginative as to call into question the weight of V.D.'s believability in a way that existing cross-examination about inconsistencies in her Las Vegas story did not. A reasonable jury could have concluded the new allegations were unreliable because they represented a dramatic departure from, or refinement of, the story V.D. previously told Diaz before Diaz took V.D. to Las Vegas where they eventually lived with Agavo until V.D. told a new story resulting in her return to California. *See*, e.g., *Holley*, 568 F.3d at 1100–01 (excluding prior statements about sex demonstrating victim had propensity to fabricate had a substantial and injurious effect or influence on the verdict). The proffered cross-examination might also have challenged the existence of the abuse by providing an alternative explanation for V.D.'s inconsistencies and nonresponsive and inaudible testimony. As such, the proffered cross-examination offered a strong potential for the jury to receive a "significantly different impression" of the credibility of Diaz and V.D. *See, e.g., Olden*, 488 U.S. at 232 (citing *Van Arsdall*, 475 U.S. at 680); *see also Davis*, 415 U.S. at 319.

And, contrary to the court's assurances that defense counsel would have an opportunity to address Diaz's credibility in response to the state's closing argument that Diaz's actions were credible and the jury could believe V.D. because Diaz believed her, there was no evidence, other than the proffered cross-examination, that defense counsel could have used to demonstrate that the jury might reasonably question the credibility of V.D. and Diaz given the dramatic departure in the nature of the allegations and Diaz's actions with full knowledge of her daughter's prior accusations against Agavo. *See supra* pp. 2, 15–22.

On the evidence and arguments, and the state's concession that the case "boiled down" to a credibility contest between V.D. and Agavo, the proffered cross-examination had unique significance and held the potential to transform the credibility determinations in a way that the permitted cross-examination and corroborating and contradicting evidence that was presented to the jury could not possibly achieve.

///

///

39

    *d. The strength of the state's case rested on the testimony of Diaz and V.D.*

    The importance of the credibility of V.D and Diaz for the state's case strongly points to the conclusion that precluding the cross-examination on the California allegations affected the determination of the jury's verdict. *See, e.g.*, *Holley,* 568 F.3d at 1098–1100 (precluding cross-examination about victim's prior statements concerning sex to show the victim had a highly active sexual imagination or familiarly with sexual activities was not harmless where the prosecution lacked physical evidence or direct corroboration to prove sexual abuse; had only one weak corroborating witness; and the prosecution vouched for the alleged victim).[18]

    In Agavo's direct appeal, the Nevada Supreme Court concluded the state resorted to vouching for the credibility of V.D. and Diaz in closing and rebuttal in what it considered, "a very close case." *See supra* note 9. As already discussed, the state conceded the case "boils down to V.D. and [Agavo] . . ." Moreover, Diaz's testimony was central because the state tied Diaz's actions and credibility to V.D.'s believability by arguing Diaz's "behavior is consistent with a mother that believes her daughter." *See supra* pp. 21–22.

    The state's closing argument that V.D. was "*very credible*" would have been less persuasive had Diaz testified V.D. accused Agavo of tying her, covering her mouth, and making her watch adult movies, a few months before the Las Vegas allegations – particularly because V.D. did not mention these restraints or movies when Nurse Suiter specifically asked V.D. about such details. *See supra* pp. 2, 6. The state's argument that Diaz "contacts friends and family so that they can come and get her, and she leaves immediately the next day. Very credible. Just what a mother would do, right? Acting like a mother bear," would have been called into question had the jury known that Diaz knew V.D. had accused Agavo of sexually abusing her and threatened to kill her before Diaz moved V.D. to Las Vegas to live and interact with Agavo. *See supra* pp. 2, 21. The full story would have undermined the state's argument that Diaz's "actions demonstrate that she's credible in this case," and "you may draw a reasonable inference from [Diaz's behavior] that she

---

[18] Respondents contend that cross-examining Diaz about the California allegations, absent proof those allegations were false, ran the risk of prejudicing the jury against Agavo because it "would have been simply presenting the jury with evidence that he had previously sexually abused V.D." (ECF No. 72 at 7.) Defense counsel was aware of the risk, and the respondents overstate the risk because the prior allegations were proved neither true nor false. *See supra* pp. 14–18.

believed her child." *See supra* p. 22. And, the argument that discovery of the drawing and abuse in Las Vegas made Diaz "so frightened, and she believes her daughter so much," would have been impossible had the jury known Diaz knew about the California allegations. *See supra* pp. 21–22.

3.  *Disposition of de novo review*

Applying *de novo* review, the court concludes precluding the proffered cross-examination had a substantial and injurious effect or influence in determining the jury's verdict and Agavo is entitled to federal habeas corpus relief on ground one.

*Remaining Claims*

The remaining claims are denied without prejudice as moot by the conditional writ grant on ground one. Agavo would not be entitled to greater relief on any of his remaining claims than the relief afforded herein, i.e., a conditional writ grant subject to possible retrial.

*Conclusion*

As discussed, the state supreme court's determination that precluding the proffered cross-examination was not a violation of the confrontation clause constitutes an objectively unreasonable application of Supreme Court authority to the facts in the state court record. The proffered cross-examination was sufficiently relevant to the credibility of Diaz and V.D. that a reasonable jury might have received a significantly different impression of their credibility had the defense been permitted to pursue the proffered cross-examination. As such, the precluded cross-examination implicated Agavo's Sixth Amendment right to confrontation. All fairminded jurists would agree that precluding the entirety of the proffered cross-examination was contrary to Supreme Court authority as unreasonable, arbitrary, and disproportionate to the purposes of preclusion. Given that the credibility of the testimony of V.D. and Diaz were determinative of the verdict and critical to the state's case, the error had a substantial and injurious effect or influence in determining the jury's verdict. Agavo is entitled to federal habeas relief for ground one.

IT IS THERFORE ORDERED that the petition for a writ of habeas corpus, as amended, is conditionally GRANTED for ground one and that, accordingly, the state court judgment of conviction of petitioner Reynaldo Agavo in No. C209538 in the Eighth Judicial District Court for the State of Nevada hereby is vacated and petitioner will be released from custody within 30 days

of the later of the conclusion of any proceedings seeking appellate or certiorari review of the court's judgment, if affirmed, or the expiration of the delays for seeking such appeal or review, unless the state files a written election in this matter within the 30-day period to retry petitioner and thereafter commences jury selection in the retrial within 120 days following the election to retry petitioner, subject to reasonable request for modification of the time periods in the judgment by either party pursuant to Rules 59 and 60. All remaining claims are DENIED without prejudice as moot following upon the conditional grant of the writ on ground one.

The clerk of court will enter final judgment accordingly, conditionally granting the petition for a writ of habeas corpus as provided above and close this case. It is the court's intention that the judgment entered pursuant to this order will be a final and appealable judgment. Final judgment is entered subject to a possible later motion to reopen the matter to enter an unconditional writ if then warranted, as a matter of enforcement of the judgment.

IT IS FURTHER ORDERED that a certificate of appealability is DENIED as reasonable jurists would not find it debatable whether the court is correct in its procedural rulings denying respondent's motions to dismiss for the reasons stated in ECF Nos. 43 and 65.

IT IS FURTHER ORDERED that petitioner's motion for an evidentiary hearing (ECF No. 82) is DENIED.

IT IS FURTHER ORDERED that the clerk shall substitute Calvin Johnson as respondent for respondent Dwight Neven.

The clerk of court will provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court, in connection with that court's case No. C209538.

Dated: October 18, 2021.

JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE

42